**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| George H. Larson,<br><br>  Plaintiff,<br><br>vs.<br><br>United Natural Foods West, Inc., a California corporation; and Sysco Arizona, Inc., a Delaware corporation,<br><br>  Defendants. | No. CV-10-185-PHX-DGC<br><br>**ORDER** |

George Larson worked as a commercial truck driver for Sysco Arizona, Inc. ("Sysco") from 1994 until May 2003, and was hired by United Natural Foods West, Inc. ("UNFI") in June 2003. In early November 2008, he was required to submit to a substance abuse professional ("SAP") evaluation on the ground that he had tested positive on a random alcohol test while employed with Sysco. The evaluation was performed by Dianne Macpherson, a certified addictions specialist. Ms. Macpherson diagnosed Larson with alcohol dependence and provided her findings to UNFI on November 14, 2008. Larson was terminated ten days later.

Larson filed suit in December 2009. Doc. 1-6 at 4-12. The amended complaint asserts three claims: a violation of the Family Medical Leave Act against UNFI, disability discrimination in violation of the Americans with Disabilities Act and the Arizona Civil Rights Act against UNFI, and negligence on the part of Sysco. Doc. 35.

The parties have filed motions for summary judgment. Docs. 117, 121, 124. The motions are fully briefed. For reasons stated below, summary judgment will be granted in favor of Defendants.[1]

**I.      Summary Judgment Standard.**

A principal purpose of summary judgment is to dispose of factually or legally unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**II.     The FMLA Claim (Count One).**

Through passage of the Family Medical Leave Act ("FMLA"), 26 U.S.C. § 2601 et seq., Congress sought, among other things, to balance the demands of the workplace with the needs of families in a manner that accommodates the legitimate interests of employers. *Id.* § 2601(b). The FMLA entitles an eligible employee to take up to twelve weeks unpaid leave because of a serious health condition. *Id.* §§ 2611(a)(2), 2612(a)(1)(D). As part of a compromise in passing the legislation, Congress created an exception for "'small operations' – that is, a potentially large company with a relatively small satellite office in a particular area." *Moreau v. Air France*, 356 F.3d 942, 945 (9th

---

[1] The requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

- 2 -

Cir. 2004). The FMLA specifically excludes from its coverage an employee who is employed at a particular worksite if the employer has less than 50 employees within 75 miles of that location. 29 U.S.C. § 2611(2)(B)(ii).

Larson claims in count one that UNFI violated the FMLA by failing to give him a full 30-day leave of absence or the leave recommended in the SAP evaluation. Doc. 35 ¶¶ 28-29. Larson was not eligible for FMLA leave, UNFI argues, because the company did not employ 50 or more persons within 75 miles of his worksite. Docs. 117 at 5-6, 139 at 1-2. The Court agrees.

While the term "worksite" is not defined in the FMLA itself, the pertinent regulations provide that for employees with no fixed worksite, such as construction and transportation workers, "the 'worksite' is the site to which they are assigned as their home base, from which their work is assigned, or to which they report." 29 C.F.R. § 825.11(a)(2). The regulations go on to specifically describe the worksite of truck drivers such as Larson: "their worksite is the terminal to which they are assigned, report for work, depart, and return after completion of a work assignment." *Id.*; *see also Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 819-20 (9th Cir. 2007) ("an employee's home base is the place from which he leaves at the start of the work period and/or returns to at the end of the work period, or at the very least, where he is physically present at some point during a typical work period").

There is no genuine dispute that, for purposes of the FMLA, Larson's worksite was the "Ryder yard" located in Phoenix, Arizona. That yard served as the Arizona "base of operations for UNFI." Doc. 123-1 ¶ 28. It was where Larson and the other Arizona drivers reported for work each day, where their loads were delivered and picked-up, where they returned their empty trailers, and where they punched in-and-out on the UNFI time clock. *Id.*; Doc. 118 ¶¶ 4-13; *see Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1110 (6th Cir. 1996) (the home base of the plaintiff truck drivers was the terminal at which they started and ended the workweek); *Bader*, 503 F.3d at 820

(the plaintiffs' worksites were "scattered 'home bases' at the various construction sites throughout the country").

UNFI has presented uncontroverted evidence (Doc. 118 ¶ 17) showing that at the time of Larson's termination, UNFI employed fewer than 50 persons within 75 miles of the Ryder yard, that is, Larson's "worksite." 29 C.F.R. § 825.11(a)(2). Larson therefore was not an eligible employee under the FMLA. 29 U.S.C. § 2611(2)(B)(ii).

Contrary to Larson's assertion (Doc. 131 ¶ 17), the number of persons employed by UNFI calls not for a legal conclusion, but a factual determination. Larson has presented no evidence from which a jury reasonably could conclude that UNFI employed 50 or more persons within 75 miles of the Ryder yard.

Larson asserts that he was considered an "employee" of the Moreno Valley, California location for UNFI (Doc. 123 ¶ 115), but the relevant question under the FMLA is the location of his "worksite." 29 U.S.C. § 2611(2)(B)(ii). The "small operations" exception focuses on the employee's worksite, as opposed to where that person may be deemed "employed," because the exception "was designed to accommodate employer concerns about 'the difficulties that an employer might have in reassigning workers to geographically separate facilities.'" *Moreau*, 356 F.3d at 945 (citation omitted).

Larson denies that he would "report" for work at the Ryder yard, but fails to explain how "physically show[ing] up to the Ryder yard" each day is materially different than reporting for work. Doc. 131 ¶ 12. Moreover, Larson himself has testified that the Ryder yard was where he "*reported* for work each day." Doc. 123-1 ¶ 28 (emphasis added). For summary judgment purposes, there is no genuine dispute as to whether Larson reported for work at the Ryder yard. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (a party may not "'create' an issue of fact and avoid summary judgment" merely by contradicting his own prior testimony).

Citing *Cobb v. Contract Transport, Inc.*, 452 F.3d 543 (6th Cir. 2006), Larson contends that a truck driver's terminal constitutes his "worksite" for FMLA purposes

only where the terminal is owned or controlled by his employer. Doc. 130 at 5. But neither Congress nor the Department of Labor has imposed an "ownership" or "control" component on the definition of "worksite." 29 U.S.C. § 2611(2)(B)(ii); 29 C.F.R. § 825.11(a)(2); *see Schexnaydre v. Aries Marine Corp.*, No. 06-0987, 2009 WL 222958, at *3-6 (W.D. La. Jan. 29, 2009) (seaman's worksite was the public Port of Cameron, Louisiana). The Court finds the holding in *Cobb* – that is, that the plaintiff's worksite was located at the company headquarters in Des Moines, Iowa rather than a truck stop in Mt. Sterling, Kentucky – inapplicable to this case. The plaintiff in *Cobb* "reported to Des Moines" and there was no clear terminal that would have "divest[ed] Des Moines of its worksite status." 452 F.3d at 558-59. In this case, by contrast, Larson reported for work at the Ryder yard in Phoenix and that yard clearly served as his terminal. *See* Docs. 118 ¶¶ 4-13, 123-1 ¶ 28.

In summary, the Court will grant summary judgment on count one in favor of UNFI because Larson was not an eligible employee under the FMLA. 29 U.S.C. § 2611(2)(B)(ii). Given this ruling, the Court need not address UNFI's arguments that Larson had no serious health condition and had not requested FMLA leave.

**III. The Disability Discrimination Claim (Count Two).**

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., prohibits an employer may from discriminating against an individual because of his disability. 42 U.S.C. § 12112(a). "Only a 'qualified individual with a disability' may state a claim for discrimination." *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1480-81 (9th Cir. 1996). The ADA defines "qualified individual" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 42 U.S.C. § 12111(8). The ADA standards for disability discrimination claims apply to similar claims brought under the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1463, as the ACRA is modeled after federal employment discrimination laws. *See April v. US Airways, Inc.*,

No. CV-09-1707-PHX-LOA, 2011 WL 488893, at *10 (D. Ariz. Feb. 7, 2011); *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997).

Larson claims in count two that UNFI, in violation of the ADA and the ACRA, terminated his employment because of his actual or perceived disability (alcoholism) and without providing him a reasonable accommodation (an extended leave of absence). Doc. 35 ¶¶ 31-44. UNFI argues, correctly, that Larson was not a "qualified individual" within the meaning of the ADA. Docs. 117 at 9-10, 139 at 4-6.

Although alcoholism may constitute a disability under the ADA, *see Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001), the statute specifically allows employers to require compliance with the Department of Transportation ("DOT") safety regulations regarding alcohol use where, as in this case, the employee is subject to such regulations. 42 U.S.C. § 12114(c)(5)(C); *see Hinnshitz v. Ortep of Pa., Inc.*, No. Civ.A 97-7148, 1998 WL 962096, at *4 n.2 (E.D. Pa. Dec. 22, 1998). The DOT regulations, which are binding on UNFI, *see Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999), provide that a motor carrier "shall not require or permit a person to drive a commercial motor vehicle" unless that person is qualified to drive one. 49 C.F.R. § 391.11(a). A person is "physically qualified to drive a commercial motor vehicle" only where he has no "current clinical diagnosis of alcoholism." 49 C.F.R. § 391.41(b)(13); *see Wyatt v. J.B. Hunt Transport, Inc.*, No. 4:08CV01501 JMM, 2009 WL 652723, at *3 (E.D. Ark. Mar. 12, 2009).

Ms. Macpherson evaluated Larson on two separate occasions and had a joint session with him and his domestic partner. Doc. 35-2 ¶ 4. In her written report dated November 14, 2008 (Doc. 35-1), Ms. Macpherson diagnosed Larson with "alcohol dependence" (*id.* at 2). This diagnosis was made using standard DSM-IV criteria (Doc. 35-2 ¶ 5), and was based on blood test results, physical damage related to excessive use of alcohol, "a chronic pattern of excessive binge drinking, repeated complaints from his domestic partner, arguments about his drinking and failed promises to cut back on his

drinking" (Doc. 35-1 at 2). Ms. Macpherson recommended that Larson abstain from all alcohol use and attend Alcoholic Anonymous meetings at least once per week for a minimum of six months, with the possibility of an additional twelve weeks of outpatient treatment if he were to suffer a single relapse. *Id.*

UNFI argues, correctly, that at the time of his termination on November 24, 2008, Larson was not qualified for his truck driving position under the DOT regulations given that he had been clinically diagnosed with alcoholism only ten days earlier. 49 C.F.R. §§ 399.11(b)(4), 391.41(b)(13). Larson notes that he was diagnosed with "alcohol dependence" (Doc. 130 at 16), but Ms. Macpherson has made clear, and Larson does not dispute, that "alcohol dependence" is the clinical diagnosis for what laypeople refer to as "alcoholism" or being an "alcoholic." Docs. 118 ¶ 52, 137 ¶ 60; *see Rafine v. Steel Dynamics, Inc.*, 349 F. Supp. 2d 1138, 1143 n.8 (N.D. Ind. 2004) (a "diagnosis of 'alcohol dependence' is synonymous with 'alcoholism'"). Larson's own pleading establishes that Ms. Macpherson had diagnosed him as an "alcoholic" (Doc. 35 ¶¶ 16-17), and this fact remains true regardless of whether Larson subsequently was recertified under the DOT regulations (Doc. 140 at 6-7).

Larson further notes (Doc. 130 at 12-13) that a leave of absence to receive treatment for alcoholism may be considered a reasonable accommodation under the ADA. *See Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 996-97 (D. Or. 1994); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135 (9th Cir. 2001). "But the courts have uniformly held that employers are not obligated to retain a disabled employee on unpaid leave indefinitely or for an excessive amount of time." *Lara v. State Farm Fire & Cas. Co.*, No. 02-1308-WEB, 2003 WL 22149667, at \*11 (D. Kan. July 24, 2003) (citations omitted); *see Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998) (the ADA "does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him indefinite leave of absence"). Nothing in the text of the "reasonable accommodation" provision, 42 U.S.C. § 12111(9), requires an employer to

wait an indefinite or overly extended period for an accommodation to achieve its intended effect. "Rather, reasonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).

"Even assuming that six months represented the point at which a full recovery from [Larson's alcoholism] might reasonably be expected, such an assumption would not avail [Larson] because the courts have found that requiring an employer to grant leave for six months as an accommodation is an excessive amount of time." *Lara*, 2003 WL 22149667, at *11 (citations omitted); *see Kalskett v. Larson Mfg. Co. of Iowa, Inc.*, 146 F. Supp. 2d 961, 981 (N.D. Iowa 2001) (same); *Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1065 (10th Cir. 2001) (same); *see also Scheer v. City of Cedar Rapids*, 956 F. Supp. 1496, 1501-02 (N.D. Iowa 1997) (retaining the plaintiff's position until he was seizure-free for six months and could perform the essential job function of driving was not a reasonable accommodation); *Carlson v. Liberty Mut. Ins. Co.*, No. 8:05-cv-817-T-24MSS, 2006 WL 2830873, at *6 (M.D. Fla. Oct. 2, 2006) (allowing the plaintiff "to work from home for six months was not a reasonable accommodation"). Stated differently, the fact that Larson's treatment for alcoholism was to last for at least "six months prevents [him] from carrying [his] burden of proving that [he] was a '*qualified individual* with a disability,' that is, someone who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Shelton v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:05CV520-H, 2006 WL 3454859, at *6 (W.D.N.C. Nov. 29, 2006) (quoting 42 U.S.C. § 12111(8); emphasis in original).

Citing the report of his expert witness, Brooks Rugemer (Doc. 123-6 at 51-59), Larson asserts that the fact that he was deemed "alcohol dependent" did not require UNFI to terminate his employment (Docs. 124 at 6). According to Mr. Rugemer, allowing

Larson "to complete the SAP recommended treatment would have been a reasonable accommodation, which would not have been inconsistent with the [DOT] regulations." Doc. 123-6 at 59. UNFI rightly objects on the grounds that Mr. Rugemer impermissibly offers legal conclusions and has established no indicia of reliability for his purported "findings" concerning UNFI's decision to terminate Larson. Doc. 137 ¶ 107. UNFI also notes, correctly, that whether it was "required" to terminate Larson is not material to the disability discrimination claims. *Id.*

As explained above, only a "qualified individual" may state a claim for disability discrimination. *Kennedy*, 90 F.3d at 1480-81. Larson has not met his burden in this respect, that is, he has failed to raise a triable issue as to whether he could perform the essential functions of his commercial truck driving position with or without a reasonable accommodation. The Court therefore will grant summary judgment on count two in favor of UNFI. Given this ruling, the Court need not address UNFI's arguments that Larson had no disability and cannot establish pretext. *See* Doc. 117 at 8-13.[2]

## IV. The Negligence Claim (Count Three).

"The elements of actionable negligence are 'the existence of a duty owed by the defendant to the plaintiff, a breach of that duty and an injury proximately caused by that breach.'" *Flowers v. K-Mart Corp.*, 616 P.2d 955, 957 (Ariz. Ct. App. 1980) (citation omitted). Sysco breached its "duty to provide accurate and complete information to prospective and existing employers," Larson claims, by providing false information to UNFI, that is, that Larson had tested positive with a .04 blood alcohol concentration ("BAC"). Doc. 35 ¶¶ 46-48.[3]

---

[2] Larson asserts that UNFI violated the ADA "when it required [him] to undergo a SAP evaluation when such examination was not legally authorized" (Doc. 124 at 14), but presents no legal argument in support of this assertion. Nor has Larson adequately pled or disclosed this purported ADA claim. Doc. 35 ¶¶ 31-44; *see* Doc. 136 at 16. His summary judgment motion will be denied in this respect.

[3] Larson admits (Doc. 144 at 14) that because his confirmed blood alcohol test was only .032, Sysco owed him no duty to advise him of the requirement to have an SAP

Larson recognizes that under Arizona law, his former employment relationship with Sysco gives rise to no duty on the part of Sysco to provide accurate and complete information to other employers. Doc. 144 at 2. Instead, Larson asserts that such a duty arises under the DOT regulations. *Id.* Larson cites a host of regulations, but none imposes the alleged duty. *See* 49 C.F.R. § 40.3 (defining alcohol screening and confirmation tests); § 40.11 (describing general responsibilities of employers); § 40.15 (describing an employer's responsibilities when using a service agent to perform alcohol testing); § 40.65 (formerly explaining the significance between screening and confirmation tests); §§ 40.241-40.255 (providing procedures for screening and confirmation tests); § 391.23(e) (requiring prospective employers to investigate for alcohol violations).

Section 391.23(g) of the regulations provides that previous employers must respond to requests for relevant information made by prospective employers and must "[t]ake all precautions reasonably necessary to ensure the accuracy of the records," but these requirements apply only after October 29, 2004. 49 C.F.R. § 391.23(g)(1)-(2); *see* 69 Fed. Reg. 16684-01, 16684 n.1 (Mar. 30, 2004) (noting that under the then-current rule there is no "requirement for previous employers to provide . . . information to prospective motor carrier employers when requested"). Larson has not shown that Sysco, in June 2003, had a duty to respond accurately and completely to UNFI's request for alcohol test information. *See* Docs. 123 ¶¶ 19-24, 124 at 9.

Larson notes that in October 2008, Sysco responded to an inquiry from UNFI by stating: "George did work here and did test positive on a random BAC. He was let go, we are a zero-tolerance company so any rehab George did would have been on his own." Doc. 123 ¶ 28, 124 at 9. Those statements are true.

---

evaluation and to provide him with a list of SAP providers (*see* Doc. 35 ¶ 48). The Court will grant summary judgment in this regard in favor of Sysco.

Larson did test positive on a random BAC test while employed with Sysco. Pursuant to the DOT regulations, he was required to take a random alcohol test on May 13, 2003, and tested positive with BAC results of .04 and .032. Doc. 123-13 at 2. By signing the alcohol testing form, Larson acknowledged that he "may not drive, perform safety-sensitive duties, or operate heavy equipment because the results are 0.02 or greater." *Id.*

Because Sysco had a "zero-tolerance policy relative to drugs and alcohol" (Doc. 123 ¶ 12), Larson was "let go" by Sysco – that is, he resigned on May 15, 2003 under threat of termination (*id.* ¶¶ 13-14; Doc. 123-14 at 12). Contrary to Larson's assertion (Doc. 144 at 5), Sysco did not claim that Larson was *required* to undergo rehabilitation, but instead stated, accurately, that any rehabilitation he did receive "would have been on his own" (Doc. 123 ¶ 28, 123-5 at 19).

It is well settled that a defendant may not be held liable in tort where the alleged false or misleading statement is true. *See* Restatement (Second) of Torts § 581A (1977); *Gilbert v. Ben-Asher*, 900 F.2d 1407, 1411 (9th Cir. 1990) (citing Restatement and noting that statements of truth are not actionable). Thus, even if the Court were to assume that Sysco had a duty to respond accurately and completely to UNFI's requests for information, Larson has created no triable issue as to whether Sysco breached that duty.

Citing an outdated version of 49 C.F.R. § 40.65, Larson asserts that the confirmation test result is the "final result" upon which further action may be taken, and that because an SAP evaluation is required only where the employee has tested at a BAC level of .04 or higher, his confirmation test result of .032 did not require him to undergo an SAP evaluation. Doc. 144 at 5.[4] Larson claims that Sysco therefore made misrepresentations when it informed UNFI that Larson had "tested [at] a level of .04 under DOT regulations, and then indicat[ed] that [he] was to undergo rehabilitation on his

---

[4] The current version of 49 C.F.R. § 40.65 addresses what an alcohol test collector must check for when the employee provides a specimen.

- 11 -

own[.]" *Id.* But Larson cites no regulation or statute requiring Sysco to provide only the confirmation test result to UNFI, or to otherwise make clear that he was not required to undergo an SAP evaluation. Sysco notes, correctly, that the DOT regulations require previous employers to inform prospective employers of drivers' "[a]lcohol tests with a result of 0.04 or higher alcohol concentration[.]" 49 C.F.R. § 40.25(b)(1); 49 C.F.R. § 40.331. In short, Larson cannot show that Sysco made a misrepresentation or otherwise breached a duty of care when it disclosed that he had a BAC of .04 on a random alcohol test. Doc. 123-15 at 22.

A hand-written notation on the June 2003 request form indicates that Larson had been "terminated" (Doc. 123-15 at 22), but a related form states that his reason for leaving Sysco was a "voluntary resignation" (*id.* at 21). Any discrepancy between those two responses is immaterial given that Larson resigned under threat of termination. *See Fendler v. Phoenix Newspapers Inc.*, 636 P.2d 127, 1261 (Ariz. Ct. App. 1981) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."). Moreover, Larson has presented no evidence showing that his reason for leaving Sysco caused UNFI to terminate him.

It is not clear that Larson has a viable tort claim against Sysco even if it were to have negligently provided false information about him to UNFI. Sysco has a qualified privilege to provide relevant alcohol test information about its former employees to other motor carriers. The DOT regulations protect a company that provides such information from tort liability unless that company "knowingly furnish[es] false information" or is "not in compliance with the procedures specified for these [alcohol related] investigations." 49 C.F.R. § 391.23(l)(1). Larson has presented no evidence showing that Sysco knew the information furnished to UNFI to be false, or that Sysco otherwise failed to comply with relevant procedures.

Finally, Larson consented to the disclosure of relevant information by Sysco (Doc. 122-2 at 9) and signed a release form affirmatively "waiv[ing] any claim of

liability against [Sysco] or its agents for information submitted in response to [UNFI's] inquiry" (*id.* at 7). Larson claims that he did not consent to the release of "inaccurate information" (Doc. 141 ¶ 18), but, as explained above, the alcohol test information released by Sysco was accurate and his reason for leaving the company is immaterial. Larson has therefore waived any negligence claim he may have against Sysco for the release of information. *See Cox v. Nasche*, 70 F.3d 1030, 1031-32 (9th Cir. 1995) (statements made by former employer were non-actionable where they were within the scope of the release).

In summary, Larson has failed to create a triable issue as to whether Sysco is liable for negligently providing information about him to UNFI. Summary judgment on count three will be granted in favor of Sysco.

**IT IS ORDERED:**

1. Defendants' motions for summary judgment (Docs. 117, 121) are **granted**.
2. Plaintiff's motion for partial summary judgment (Doc. 124) is **denied**.
3. The motion in limine (Doc. 116) is **denied** as moot.
4. The Clerk is directed to enter judgment accordingly.

Dated this 29th day of July, 2011.

_____
David G. Campbell
United States District Judge